**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

ELIZABETH DOE,

      Plaintiff

v.

                              Civil Action No.      6:17-CV-27

BAYLOR UNIVERSITY,

      Defendant.

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

      Plaintiff, Elizabeth Doe, for her First Amended Complaint against Baylor University ("BAYLOR"), states as follows:

**PARTIES, JURIDICTION, AND VENUE**

      1.      Plaintiff Elizabeth Doe is a resident of the state of Virginia.

      2.      Defendant BAYLOR is a private educational institution with its campus located in Waco, Texas.  BAYLOR is governed by the BAYLOR Board of Regents.

      3.      BAYLOR receives federal funding and is subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

      4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

      5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

**GENERAL ALLEGATIONS**

      6.      This complaint arises from a brutal gang rape at the hands of two BAYLOR football players, Tre'Von Armstead and Shamycheal Chatman, that occurred during a time in BAYLOR football that has become known as the most violent and atrocious in school history.

      7.      Ms. Doe is an alumna of BAYLOR, having graduated in December 2014.

8.      Ms. Doe applied to BAYLOR in the fall of 2009.

9.      In making her application, Ms. Doe, a National Honors Society high school student, explained her reason for choosing BAYLOR:

> *I want to attend Baylor University primarily because of its strong emphasis on developing Christian faith and learning as well as its dedication to serving those in need.*

10.     In the fall of 2010, Ms. Doe left home to begin her education at BAYLOR, hoping to pursue a degree in medicine and knowing little about the BAYLOR football program other than its perennial losing record.

### BAYLOR FOOTBALL UNDER ART BRILES

11.     Prior to the arrival of coach Charles Arthur "Art" Briles ("Briles") in 2008, BAYLOR football was comparatively one of the worst, if not the worst, team in the Big 12 Southern Conference.  It finished in last place in 13 of 14 consecutive seasons.

12.     Hired in 2008, Briles was brought to BAYLOR specifically to fix the problem.  Upon hiring, Briles declared, "What we have to do is win football games.  That's our mission."

13.     At the expense of many young women on campus, BAYLOR football soon did just that.

14.     Briles' efforts to rebuild BAYLOR football centered on recruiting his own athletes from Texas and around the nation to come to Waco and help accomplish his mission.

15.     BAYLOR was an overnight success under Briles.  Within a few short years, his recruits became one of the most feared group of football players in the nation, dominating the Big 12 Southern Conference and becoming a national title contender.  Over the span of four seasons from 2011-2014, Briles' recruits would win an unprecedented 42 football games. After

fifteen years of finishing at or near the bottom of their football conference standings, BAYLOR was quickly on top of the Big 12 Conference.

16.     In response, alumni donations were on the rise and BAYLOR made plans to build a new $266 million football stadium.

17.     As a result of this sudden success, BAYLOR football players themselves became larger-than-life celebrities on campus as BAYLOR football mania consumed the campus to a degree not seen in decades.   Then-BAYLOR President and Chancellor Kenneth Starr, who regularly led the football team out on the field, proclaimed that BAYLOR was entering its "Golden Era."

18.     To further this image, BAYLOR plastered its campus with the images of the school's new heroes — from giant posters of players, to event and game hype, to screen saver images covering student-accessible computers.   BAYLOR was maximizing its football public relations machine and as a result, daily life for BAYLOR students was dominated by football.

19.     While Briles' players were being hyped as celebrities on campus and around Waco, behind the scenes the players engaged in more than just sports.   From 2009-2015, BAYLOR football players were responsible for numerous crimes involving violent physical assault, armed robbery, burglary, drugs, guns, and, notably, the most widespread culture of sexual violence and abuse of women ever reported in a collegiate athletic program.

20.     BAYLOR football under Briles had run wild, in more ways than one, and BAYLOR was doing nothing to stop it.

## THE CULTURE OF SEXUAL VIOLENCE AT BAYLOR:  RECRUITING

21.     At the heart of BAYLOR's renewed success on the football field were the recruiting efforts of Briles and his staff.  In order to ensure that a last place team could recruit the players needed to win football games, recruiting efforts used sex to sell the program.

22.     Central to their recruiting efforts, BAYLOR football coaching staff implemented a "Show em a good time"[1] policy which permitted members of the BAYLOR football team to engage in unrestricted behavior with no consequences including but not limited to:

    a.  Players arranging for women, alcohol and illegal drugs for parties when recruits were in town;

    b.  Paying for and escorting underage recruits to bars and strip clubs; and

    c.  Paying for off-campus football parties (which repeatedly resulted in gang rape of women by the athletes).

23.     Not only were BAYLOR's football coaching staff instrumental in actively implementing these recruiting policies and practices, they also encouraged them. Assistant Coach Kendall Briles, while recruiting one Dallas area high school athlete stated, "Do you like white women?  Because we have a lot of them at BAYLOR and they LOVE football players."

24.     BAYLOR football coaching staff also arranged for women to have sex with recruits on their official campus visits.  On one such occasion, a BAYLOR football player stated that BAYLOR coaches sent two women from the BAYLOR Bruins program to his hotel room and the room of another recruit to engage in sex with the two men.

---

[1] "Show em a good time" are the words used by one BAYLOR football player referencing what his coaches had told them to do with the recruits.

## THE CULTURE OF SEXUAL VIOLENCE AT BAYLOR: THE HOSTESS PROGRAM

25.     In conjunction with these recruiting practices, BAYLOR also relied heavily upon its long standing female hostess program.

26.     The "BAYLOR Bruin" program, like its predecessors the "BAYLOR Gold" and "BAYLOR Belles," is a football "hostess" program with the purpose of using attractive female students to escort recruits and their families to campus events and football games on official visits to BAYLOR.

27.     Unofficially, the Bruins are expected to make sure the recruits have a good time by socializing with the recruits, attending parties, and seeing to it that the recruits enjoy their visit to BAYLOR.

28.     In furtherance of this policy, as stated above, some BAYLOR Bruins were at times used to engage in sexual acts with the recruits to help secure the recruits' commitment to BAYLOR.

29.     Though the Bruins had an official policy of no sexual contact with the recruits or football players, BAYLOR had an unofficial policy of looking the other way when there was sexual intercourse between the Bruins and the football players.

30.     The hostess program, like similar programs around the country, has been criticized for its use of sexuality and the implied promise of female companionship should the recruit choose BAYLOR.  The connection between these hostess programs and sexual violence is well documented.  *See Simpson v University of Colorado*, 500 F.3rd 1170, 1173-1184 (10th Cir. 2007).

31.     As Ms. Doe would soon find out, many Bruins in fact did engage in sex with the players once they became BAYLOR football players.  In essence, the implied promise of sex during the recruiting stage often became the reality.

32.     On more than one occasion, a BAYLOR Bruin hostess was impregnated by a member of the football team.

33.     Through the use of sex with recruits and the continued lure of sex should the recruits attend BAYLOR, BAYLOR's recruiting policies and practices, along with the BAYLOR Bruin football hostess program, directly contributed to the creation of a culture of sexual violence that permeated BAYLOR and from which Ms. Doe would soon suffer.

## THE CULTURE OF SEXUAL VIOLENCE AT BAYLOR:  BAYLOR CONTROLLED THE CONTEXT OF THE RAPE AND HARASSMENT

34.     BAYLOR had both notice and control over the context of the sexual harassment and violence perpetrated by its football players.

35.     Almost all of the football players involved in these rapes were recruited and brought to Waco to play football.

36.     On information and belief, none of the assailants would have been in Waco but for BAYLOR's recruiting and scholarships to play football at BAYLOR.

37.     On information and belief, the BAYLOR athletic department would coordinate housing for the scholarship football players which was almost entirely located in off campus apartments.[2]

38.     BAYLOR paid for the off-campus housing, which was the location of most of the sexual assaults, by use of a housing stipend credited to the athletes' accounts.

---

[2] BAYLOR was known for a substantial housing shortage which required the majority of all students to live off campus.

39.     When necessary, the BAYLOR athletic department would manage the housing assignments of BAYLOR football players and require specific housing changes or restrictions.

### THE CULTURE OF SEXUAL VIOLENCE AT BAYLOR: 52 ACTS OF RAPE IN FOUR YEARS

40.     Under Briles, the culture of BAYLOR football and rape became synonymous.

41.     Based upon investigation, in the span of four years — 2011 through 2014 — Plaintiff is aware of at least 52 acts of rape, including five gang rapes, by not less than 31 different football players under Briles.

42.     BAYLOR football's rape culture resulted in student violence on and off campus. In the course of those 52 acts of rape, the majority were the product of off-campus parties hosted by Briles' football players.

43.     At least two of the gang rapes were committed by ten or more different BAYLOR football players at one time.  Some of the BAYLOR football players recorded the rapes on their phones and would later distribute the recordings to other teammates.

44.     After reporting their rapes by the football players to BAYLOR, some rape victims were encouraged by BAYLOR employees to leave school without further investigation.

45.     As a result of at least 52 acts of rape in five years by at least 31 football players, BAYLOR has dismissed exactly two of those football players from the university.

46.     In one such football case, the victim reported both sexual and dating violence to BAYLOR hoping for assistance with academic accommodation.  The school's Title IX office advised her of the potential for investigation.  The young woman refused, explaining that she would get killed and so would the title IX coordinator.

47.     BAYLOR Title IX investigator, Gabrielle Lyons, who came to BAYLOR in 2015 around the time that several 2012-13 gang rapes were being investigated, left several months

later due to the amount of the violence.  Ms. Lyons recently stated in the press, "[t]he violence is what took me back. I was just appalled at the level of violence taking place so rampantly at the institution."  Ms. Lyons stated that nearly a third of the cases in her office were from the football program, which made up less than one percent of BAYLOR's enrollment.  Ms. Lyons left BAYLOR after being advised by the Baylor Police Department that she was not safe to do her job and would do well to look over her shoulder when walking to her car.

48.    The BAYLOR Board of Regents has also acknowledged the culture of sexual violence.  Regent J. Cary Gray recently stated, "There was a cultural issue there that was putting winning football games above everything else, including our values." "We did not have a caring community when it came to these women who reported that they were assaulted. And that is not OK."

49.    Similarly, BAYLOR Regent and Pastor Neal Jeffrey recently stated, "Football's a big, obviously, a big deal in Texas, it's a big deal at Baylor. And we did have a lot of success. And Art, in one sense, had us where we've never been before. We were winning, and things were awesome. I think our main problem was: it's hard to mess up awesome. Nobody wanted to mess it up."

50.    Michelle Davis, a former member of the Baylor Advisory Board on Sexual Assault, told ESPN in early 2016 that BAYLOR officials have known at least for a few years of a much larger problem with sexual assaults and athletes.

51.    By April 18, 2013, this culture of sexual violence and the risk to female students was well known to BAYLOR.

52.    In the fall of 2015, after learning that BAYLOR officials had failed to discipline football player and convicted rapist Sam Ukwuachu, BAYLOR Regents contracted with

Philadelphia law firm Pepper Hamilton ("Pepper") for an internal audit of BAYLOR's Title IX compliance. Pepper reported its findings to the BAYLOR Board of Regents, which in turn published a summary of Pepper's findings (the "BAYLOR Findings"), confirming that the prevalence of rape and domestic violence within the BAYLOR football program was widespread.

53.     Reporting similar numbers over a shorter timeframe than Plaintiff's investigation, Pepper found 17 victims of rape or domestic violence involving 19 athletes, including four gang rapes. According to one BAYLOR regent, Pepper's investigation also showed that some players took part in a horrifying and painful string of sexual assaults over the course of several years.

54.     The BAYLOR Findings also confirmed that a myriad of sexually hostile BAYLOR policies existed prior to the gang rape of Ms. Doe. Specifically, the BAYLOR Findings looked at policies in place between 2012 and 2015.

**THE CULTURE OF SEXUAL VIOLENCE AT BAYLOR:  THE BAYLOR POLICIES**

55.     **Policy of No or Little Discipline for Football Players**. The football program routinely and deliberately failed to discipline players implicated in reports of sexual assaults and dating violence. This policy was well documented in the BAYLOR Findings and was consistent with Ms. Doe's own interactions with the football program while a Bruin. As the BAYLOR Findings state, "The choices made by football staff and athletics leadership, in some instances, posed a risk to campus safety and the integrity of the University."

56.     **Policy of Interference with Female Students' Access to Help**. The BAYLOR Findings state, "In addition, some football coaches and staff took improper steps in response to disclosures of sexual assault or dating violence that precluded the University from fulfilling its legal obligations. Football staff conducted their own untrained internal inquiries, which improperly discredited complainants and denied them the right to a fair, impartial and informed

investigation, interim measures or processes promised to them under University policy. In some cases, internal steps gave the illusion of responsiveness to complainants but failed to provide a meaningful institutional response under Title IX."

57.     **Policy of Enacting a Separate System of Discipline for the Football Team**. The BAYLOR Findings conclude that the football program created a separate system of discipline which ignored football player misconduct and fueled the perception that the football players were untouchable:

> "The football program also operates an internal system of discipline, separate from University processes, which is fundamentally inconsistent with the mindset required for effective Title IX implementation, and has resulted in a lack of parity vis-à-vis the broader student population. This informal system of discipline involves multiple coaches and administrators, relies heavily upon individual judgment in lieu of clear standards for discipline, and has resulted in conduct being ignored or players being dismissed from the team based on an informal and subjective process. The ad hoc internal system of discipline lacks protocols for consistency with University policy and is wholly undocumented. The football program's separate system of internal discipline reinforces the perception that rules applicable to other students are not applicable to football players, improperly insulates football players from appropriate disciplinary consequences, and puts students, the program, and the institution at risk of future misconduct. It is also inconsistent with institutional reporting obligations."

58.     **Policy of Not Reporting Allegations of Sexual Violence and Dating Violence**. The Athletic Department also had a policy of not reporting instances of sexual and dating

violence to anyone outside of athletics, when it should have reported to appropriate administrators outside of athletics.   Again, this policy was documented in the BAYLOR Findings, which state the consequence of this policy as follows: "As a result, no action was taken to support complainants, fairly and impartially evaluate the conduct under Title IX, address identified cultural concerns within the football program, or protect campus safety once aware of a potential pattern of sexual violence by multiple football players."   The Baylor Findings additionally state:

> "Further, because reports were not shared outside of athletics, the University missed critical opportunities to impose appropriate disciplinary action that would have removed offenders from campus and possibly precluded future acts of sexual violence against BAYLOR students. In some instances, the football program dismissed players for unspecified team violations and assisted them in transferring to other schools. As a result, some football coaches and staff abdicated responsibilities under Title IX and Clery; to student welfare; to the health and safety of complainants; and to BAYLOR's institutional values."

59.    **Policy of Diverting Cases Away from Student Conduct or Criminal Processes**.   The BAYLOR Findings state, "Football coaches and staff took affirmative steps to maintain internal control over discipline of players and to actively divert cases from the student conduct or criminal processes.   In some cases, football coaches and staff had inappropriate involvement in disciplinary and criminal matters or engaged in improper conduct that reinforced an overall perception that football was above the rules, and that there was no culture of accountability for misconduct."  This policy of diversion undermined discipline and added to the culture that football players could be sexually violent with impunity.

60.     **Policy of Not Educating Staff/Students**. BAYLOR failed to train students and staff about Title IX.  Women on campus had no idea what resources were available to them and were unaware of Title IX or how BAYLOR's Title IX office could help.   The BAYLOR Findings concluded:

> "BAYLOR failed to provide training and education to students; failed to identify and train responsible employees under Title IX; failed to provide clear information about reporting options and resources on campus; failed to have a centralized process for ensuring that all reports reached the Title IX Coordinator."

61.     **Policy of Accepting Football Players with Histories of Violence Toward Women**. The BAYLOR Findings demonstrates that the football program had a policy of accepting high-risk transfers from other football programs without conducting due diligence:

> "BAYLOR did not consistently conduct due diligence with respect to potential transfers. In at least one identified instance, the process reflected a failure to conduct appropriate due diligence and assessment of risk regarding past criminal or student conduct and an affirmative decision not to seek additional information about an athlete's prior criminal or student conduct records. BAYLOR did not adhere to a consistent protocol regarding transfers and importantly, BAYLOR did not consistently follow previously implemented processes regarding criminal background checks, request for records of any prior college disciplinary actions, and character reference screening forms."

62.     **Policy of "Show 'em a good time" in Recruiting**.   In addition to the aforementioned policies which are supported in the BAYLOR Findings, BAYLOR also had a "show 'em a good time" recruiting policy, which included making BAYLOR Bruins available

for sex with recruits, taking recruits to strip clubs, recruiting based on implied promises of sex with BAYLOR women who "love football players," and using alcohol and drugs in the recruiting process.

63.    With knowledge and notice of the inordinate number of assaults, BAYLOR deliberately failed to address the risk, as found by the BAYLOR Findings, which explain, "Once aware of a potential pattern of sexual violence, the University failed to take prompt and effective action to protect campus safety and protect future victims from harm.  Further, BAYLOR failed to consider patterns, trends or climate-related concerns that would enable the University to take prompt and responsive action to individual and community concerns. BAYLOR failed to identify, eliminate, prevent or address a potential hostile environment in individual cases, and took insufficient steps with respect to both individual complainants and broader community remedies."

64.    As BAYLOR continued to fail to address acts of sexual violence, the football players became increasingly emboldened, knowing that they could break the law, code of conduct, and general standards of human decency with no repercussions.  This attitude, in turn, fueled the widespread violence within the program and spurred on the football players to gang rape Ms. Doe and others.

65.    The BAYLOR Findings concluded that "BAYLOR failed to maintain effective oversight and supervision of the Athletics Department as it related to the effective implementation of Title IX. Leadership challenges and communications issues hindered enforcement of rules and policies, and created a cultural perception that football was above the rules."

66.     The BAYLOR Findings demonstrated (a) that the BAYLOR Athletic Department and football program had policies that led to the sexual assaults of Ms. Doe, and (b) that BAYLOR was deliberately indifferent to a known and substantial risk of sexual harassment and assault within the football program.

67.     On the date of Ms. Doe's rape, BAYLOR was well aware of the risk its recruiting practices and football culture posed to its female students.

68.     In at least five instances over the same time period of 2011-2014, the rape or physical abuse of female students by the football team was reported directly to football coaches and athletic department personnel who took no action.

**BAYLOR REGENTS CONFIRM THE ENDEMIC CULTURE OF SEXUAL VIOLENCE AT BAYLOR**

69.     On February 2nd, 2017, three BAYLOR regents filed a response to a defamation lawsuit filed against them by former athletic department administrator, Colin Schillinglaw (the "Answer"). *See* Exhibit 1.

70.     The Answer, filed in Cause No. DC-17-01225 in the District Court of Dallas County, Texas, confirmed the endemic culture of sexual violence within its football program alleged herein.  "The investigation uncovered an endemic culture in the football program of attempting to conceal and avoid reporting disciplinary problems involving players."

71.     The Answer detailed, at great length, the "black hole" of misconduct wherein BAYLOR athletes avoided discipline for a wide range of violent behaviors. It found that BAYLOR "fostered an environment in which football players were insulated from the University disciplinary system and, when combined with Baylor's existing Title IX deficiencies, led to reports of sexual assault and other disciplinary problems involving football players being mishandled or not reported to appropriate Baylor personnel."

72.    According to the BAYLOR Regents, BAYLOR athletic officials, including Briles, Schillinglaw, and others, were informed of player misconduct, but routinely chose not to report these incidents to BAYLOR officials outside the football program, including the Office of Judicial Affairs and the Title IX Office.

"Briles encouraged Shillinglaw and others on his staff to keep the problems internal to the program and not alert other campus authorities. For example, when confronted with allegations of a gang rape against some of his players, Briles made no real attempt to determine if his players were responsible, to report them to authorities outside the Athletics Department or to make sure his players were punished, if warranted."

73.    The Answer also reiterated the prevalence of gang rape on BAYLOR's campus, noting that the BAYLOR Findings uncovered numerous instances of gang rapes committed by football players.  For instance, in 2013 and prior to Ms. Doe's gang rape, a BAYLOR student-athlete was gang raped by five football players at an off campus party. The student-athlete told her coach and identified the five athletes. The coach informed BAYLOR Athletic Director Ian McCaw and Coach Briles, both of whom offered no assistance and told the coach there was little they could do. The student-athlete went on to inform additional members of the athletic staff that a gang rape had occurred, but no one within the athletic department reported the incident to Judicial Affairs, the Title IX Office, or the police, despite knowledge that Judicial Affairs had jurisdiction over the investigation of sexual assaults at BAYLOR. Instead, the "apparent response was to engage in victim-blaming" and determinations "that the accusations of gang rape were in a "gray area" and there was no definitive evidence of sexual assault."

74.     The Answer acknowledged that the BAYLOR Findings had horrified and stunned the Board of Regents because Baylor's own investigation had:

"[U]ncovered evidence that Coach Briles, Schillinglaw, and others in the football program had developed, enabled, and encouraged a culture within the football program that deliberately insulated players from the normal University disciplinary process."

75.     Unrestrained and unchecked, BAYLOR's football team was given the clear message that they were free to engage in unlimited criminal activity in and around Waco, Texas and many of them did just that.

## SHAMYCHEAL CHATMAN IS REPORTED FOR RAPING A STUDENT ATHLETIC TRAINER

76.     Prior to the rape of Ms. Doe, BAYLOR football player Shamycheal Chatman was reported for raping another BAYLOR student, a student athletic trainer for the BAYLOR football team, at his off-campus apartment.

77.     The student trainer's rape was reported to the BAYLOR Athletic Department.  At the time, one staff member of the athletic training program warned the football team that they needed to get control over their players or else the football team would no longer have student trainers.

78.     On information and belief, BAYLOR reached an agreement with the victim to pay for her education in exchange for a non-disclosure agreement.

79.     On information and belief, however, BAYLOR took no action to discipline Chatman for raping the student trainer.   Instead, BAYLOR moved the trainer from her football assignment to a women's sports team.

80.     The BAYLOR Findings confirmed this.  "In addition, in one instance, in response to concerns about misconduct by football players that could contribute to a hostile environment, an academic program that required interaction with the football program improperly restricted educational opportunities for students, rather than take steps to eliminate a potential hostile environment."

**PLAINTIFF IS VIOLENTLY GANG RAPED BY TWO FOOTBALL PLAYERS**

81.     In the fall of 2012, Ms. Doe excitedly joined the Bruins.  Aside from her interest in football, Ms. Doe was hoping that the Bruin program would become a type of informal sorority where she would develop many close friendships as she could not afford a traditional sorority.

82.     On the night of April 18, 2013, Ms. Doe was out with some other Bruins when one of them wanted to stop by the home of a first-year transfer from Penn State University, Shawn Oakman.[3]

83.     April 18, 2013, was one of the days of BAYLOR's annual Diadeloso party weekend.

84.     Diadeloso is known in Waco for being the big spring party weekend filled with overconsumption of alcohol by BAYLOR students and increased police activity to respond to misconduct.

85.     The preceding year during Diadeloso, three different women were gang raped by members of the BAYLOR football team at a football party.

---

[3] Mr. Oakman was recruited by BAYLOR football and brought to Waco after being asked to leave Penn State University following reports of violence against women including, according to Oakman, a rumor that he had raped someone.  Shortly after Ms. Doe's departure from BAYLOR, Mr. Oakman was indicted for raping a woman in his apartment in a separate incident.  That matter is currently pending.

86.     Upon transferring from Penn State University, Mr. Oakman was provided housing at the Outpost Apartments, off campus housing arranged for Oakman by BAYLOR.

87.     On information and belief, the Outpost is a common residence for BAYLOR football players.

88.     Mr. Oakman was hosting a football party that evening with a number of his teammates in attendance, including freshman football players Tre'Von Armstead and Shamycheal Chatman.

89.     While at Mr. Oakman's party, Ms. Doe became very intoxicated.

90.     Ms. Doe later learned that Mr. Chatman and Mr. Armstead accompanied Ms. Doe from the party and back to her apartment.

91.     Later that evening, Ms. Doe's roommate came home with her boyfriend, and noticed that the front door to the apartment was ajar.  Concerned that someone was in the house unlawfully, the roommate's boyfriend walked through the residence checking for any trouble.

92.     As he was checking the upstairs bedroom, the door to the room shared by Ms. Doe and the man's girlfriend was closed.  The roommate's boyfriend could hear what sounded like wrestling and a fist hitting someone.  The next thing that he heard was a loud bang and a slapping noise accompanied by hearing a woman's voice loudly saying "no."  The roommate's boyfriend then shouted from the other side of the door to determine if everything was okay.  One of the men inside of the bedroom yelled out that she "was fine" but the roommate's boyfriend insisted further on seeing her come out of the room.  Armstead and Chatman would soon emerge from the room with 6'7", 311 pound Armstead attempting to stare down the roommate's boyfriend.  The young man looked into the dark room and saw Ms. Doe partially unclothed on the floor of the bedroom and said "she is not fine."

93.     The young man indicated to Armstead and Chatman that he was calling 911, which he did as soon as they left.

94.     Prior to the police arriving, another BAYLOR Bruin showed up at Ms. Doe's apartment with at least one other individual. The Bruin was somehow already aware that a rape had been reported and was trying to get Ms. Doe to cover for the assailants.  The Bruin told Ms. Doe that she needed to tell the police that she had "consensual sex with one white male" in an apparent effort to protect the BAYLOR athletes.

95.     The Title IX investigation would later show that Chatman had called the Bruin and given her this assignment.

96.     The Bruin remained on scene when the Waco Police Department arrived, interfering with Ms. Doe's recitation of events.  Nonetheless, the roommate's boyfriend and Ms. Doe's roommate clearly reported the events as rape by Chatman and Armstead.

97.     While on scene, Waco Police noted that Ms. Doe was highly intoxicated, had a bruise on her cheek and a bite mark on her neck.

98.     The Waco Police Department did little with the case, indicating that it was likely too difficult to prove and gave Ms. Doe the alternate option of placing the investigation in "suspended" status.  Not wanting the Waco Police to close the case, she chose suspended status.

99.     Waco Police never even attempted to interview Armstead or Chatman.

100.     Prior to suspending their investigation, Waco Police notified BAYLOR Police of what had been reported about their two football players.

101.     In response to learning that two of their football players had been reported for rape, BAYLOR took no action.

102.     In a 60 Minutes Sports interview that aired on October 31, 2016, BAYLOR Chief Financial Officer, Reagan Ramsower who oversees the BAYLOR Police Department admitted, "There was a police report; I suppose it stayed with the police department.  It never came out of the police department. That was a significant failure to respond by our police department, there's no doubt about it."

103.     After Ms. Doe became the second woman to implicate Chatman in a rape, Chatman left BAYLOR.

104.     In the BAYLOR Findings, Pepper noted, "In some instances, the football program dismissed players for unspecified team violations and assisted them in transferring to other schools."

105.     Following the completion of the 2013 spring semester, Chatman transferred to Sam Houston State University, where he became a member of their football team.

**BAYLOR SUBJECTS MS. DOE TO A CONTINUING HOSTILE ENVIRONMENT**

106.     BAYLOR's discrimination against Ms. Doe did not end with the failure to investigate her rape.

107.     Ms. Doe continued to feel the sexually hositle effects of Baylor's policies for the remainder of her time at BAYLOR, which ended in December 2014.

108.     The result of BAYLOR's continued sexually hostile and discriminatory policies combined with Ms. Doe being required to attend school with one of her rapists, created a highly hostile educational environment for Ms. Doe on a daily basis.

109.     BAYLOR was clearly on notice of the report that one of their female students, Ms. Doe, was raped by two BAYLOR football players.

110.    As a result, BAYLOR had control over both of the offenders as well as the context of the ongoing harassment and had the ability to address its effects and prevent its recurrence.

111.    As a result of BAYLOR's policies to avoid discipline for football players, Ms. Doe was forced to continue to attend school in the presence of Armstead.

112.    Ms. Doe walked onto campus in daily fear of running into her rapist and in fact did just that on repeat occasions. Such run-ins would trigger panic attacks where Ms. Doe would hyperventilate, suffer from nausea, have light headedness and experience other emotional trauma.

113.    Following these panic attacks, Doe would then struggle to attend classes and concentrate.  With her learning environment shattered, her grades suffered and she began to limit her involvement in any nonessential activity at BAYLOR by staying away from campus except when needed for classes.  Ms. Doe also resigned from the BAYLOR Bruin program.

114.    As a result of the rape and when Ms. Doe would get overwhelmed with anxiety, Ms. Doe would stay the night at her then-boyfriend's residence.  At some point, Ms. Doe learned that Armstead lived in that very same building.  Ms. Doe could not escape him both on and off campus.

115.    For the remainder of her time at BAYLOR, Ms. Doe struggled under the pressure of the hostile environment and her academics, her educational opportunities, and her emotional well-being suffered.

116.    Meanwhile, Armstead and his football career remained unhindered and he would become one of the star athletes for Briles' program earning all Big-12 honors in 2014.

**MS. DOE LEARNS OF NEW TITLE IX OFFICE AND CONTACTS BAYLOR**

117.    In the summer of 2015, several months after Ms. Doe finished her education at Baylor, she learned of the new Title IX office and coordinator Patty Crawford.

118.    Despite having graduated and moved home, Ms. Doe contacted that office to inquire about further pursing the matter against her assailants.  After speaking with the new staff, Ms. Doe made a report.

119.    In the fall of 2015, BAYLOR Title IX staff, including Ms. Crawford, Gabrielle Lyons and others, investigated the rape complaint that BAYLOR Police had sat on for more than two years.

120.    Baylor hired an outside adjudicator to decide the case concerning Armstead.  The adjudicator fund Armstead responsible for the rape. Armstead was expelled in the spring of 2016.

121.    Apparently to protect its reputation, BAYLOR said nothing publicly about the rape and instead indicated that Armstead had been dismissed for "violation of team rules."

122.    As a result of BAYLOR's actions and inactions as alleged herein, Plaintiff has suffered, and continues to suffer, physical injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, and loss of enjoyment of life; and expenses for future medical and psychological care.

**FIRST CLAIM FOR RELIEF**
**DISCRIMINATION UNDER TITLE IX: SEXUALLY HOSTILE CULTURE**
**(Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a))**

Plaintiff incorporates the allegations of the preceding paragraphs.

123.    BAYLOR actively created and was deliberately indifferent to a culture of sexual hostility and violence within its football program by instituting several policies and permitting practices that included but are not limited to:

a.     Policy of No or Little Discipline for Football Players;

b.     Policy of Interference with Female Students' Access to Help;

c.     Policy of Enacting a Separate System of Discipline for the Football Team;

d.     Policy of Not Reporting Allegations of Sexual Violence and Dating Violence;

e.     Policy of Diverting Cases Away from Student Conduct or Criminal Processes;

f.     Policy of Not Educating Staff/Students;

g.     Policy of Accepting Football Players with Histories of Violence Toward Women;

h.     Policy of "Show 'em a good time" in Recruiting; and

i.     The use of a sexually hostile football hostess program.

124.    BAYLOR's sexually hostile policies and practices were a proximate cause of Ms. Doe being subjected to 20 months of sexual harassment in the form of 1) gang rape by football players, 2) a hostile educational environment, and 3) ongoing harassment by forcing her to interact with her assailants and their teammates in daily life on campus and within the Bruin Hostess program.

125.    The sexual harassment that Ms. Doe suffered was so severe, pervasive, and objectively offensive that it effectively barred her access to educational opportunities and benefits.

126.    As a direct and proximate result of BAYLOR'S creation of and deliberate indifference to its sexually hostile educational environment, Ms. Doe suffered damages and injuries for which BAYLOR is liable.

**SECOND CLAIM FOR RELIEF**
**GENDER DISCRIMINATION UNDER TITLE IX**
**DELIBERATE INDIFERENCE TO PLAINTIFF'S RAPE**
**(Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a))**

Plaintiff incorporates the allegations of the preceding paragraphs.

127.    BAYLOR was on notice and aware of Ms. Doe's rape as well as the identity of the football player assailants within days of the rape itself.

128.    BAYLOR deliberately chose not to investigate those football players after learning of their rape of Ms. Doe.

129.    Such failure to investigate the assault, conduct any disciplinary proceedings, or contact Ms. Doe and offer any assistance or resources was clearly unreasonable.

130.    BAYLOR's deliberate indifference to Plaintiff's rape exposed her to continued sexual harassment which was so severe, pervasive, and objectively offensive that it effectively barred her access to meaningful educational opportunities and benefits including academics, on campus events and activities, and the BAYLOR Bruin program.

131.    As a direct and proximate result of BAYLOR'S deliberate indifference to Plaintiff's rape, Ms. Doe suffered damages and injuries for which BAYLOR is liable.

**THIRD CLAIM FOR RELIEF**
**NEGLIGENCE - SEXUALLY HOSTILE CULTURE**

Plaintiff incorporates the allegations of the preceding paragraphs.

132.    BAYLOR owed a duty of reasonable care to protect Ms. Doe from a sexually hostile environment which BAYLOR created and that was foreseeable.

133.    BAYLOR had knowledge of the serious risk of sexual harassment and assault that that was occurring within the BAYLOR football program, including but not limited to, at off-campus football parties, and was aware of the risk of sexual violence toward their female students.

134.    The aforementioned sexually hostile BAYLOR football policies made the likelihood of sexual violence toward BAYLOR's female students foreseeable.

135.    BAYLOR breached its duty through its aforementioned sexually discriminatory policies and practices without any regard for the safety of women like Ms. Doe at BAYLOR.

136.    As a direct and proximate result of BAYLOR'S decision to adopt such policies and prioritize winning football games over the safety of its students, Ms. Doe suffered damages and injuries for which BAYLOR is liable under state law.

**FOURTH CLAIM FOR RELIEF**
**NEGLIGENCE-FAILURE TO SUPERVISE**

Plaintiff incorporates the allegations of the preceding paragraphs.

137.    BAYLOR owed a duty of reasonable care to Ms. Doe to supervise its employees within the football program.

138.    In April 2013, BAYLOR officials were on notice that its employees within the football program were failing to discipline players were ignoring reports of sexual and physical violence against female students.  BAYLOR officials were also on notice that the employees of the football team had established a sexually hostile culture towards women by use of the aforementioned policies of indifference to violence against women.

139.    BAYLOR breached its duty by failing to supervise and address its employees' actions and inactions that led to this culture.

140.    As a direct and proximate result of BAYLOR's failure to supervise its employees within the football program, Ms. Doe suffered damages and injuries for which BAYLOR is liable under state law.

**FIFTH CLAIM FOR RELIEF**
**NEGLIGENCE-FAILURE TO RESPOND TO FIRST RAPE OF**
**SHAMYCHEAL CHATMAN**

Plaintiff incorporates the allegations of the preceding paragraphs.

141.    BAYLOR owed a duty of reasonable care to protect Ms. Doe from a known risk of harm.

142.    BAYLOR was specifically on notice that football player Shamycheal Chatman was reported for raping a football student trainer prior to the rape of Ms. Doe.

143.    BAYLOR breached its duty by failing to investigate a known report of rape perpetrated by Chatman, failing to institute disciplinary measures, and failing to warn other BAYLOR students of his violent tendencies, leaving him to repeat his behavior upon other unsuspecting BAYLOR students.

144.    As a direct and proximate result of BAYLOR's breach of its duty, Shamycheal Chatman raped Ms. Doe.

145.    As a direct and proximate result, Ms. Doe suffered damages and injuries for which BAYLOR is liable under state law.

**SIXTH CLAIM FOR RELIEF**
**GROSS NEGLIGENCE**

Plaintiff incorporates the allegations of the preceding paragraphs.

146.    Plaintiff would show that the wrong done by BAYLOR as alleged herein was aggravated on account of the type of conduct for which the law allows the imposition of exemplary damages, in that the BAYLOR's conduct, as described above, when viewed from the BAYLOR's standpoint, or objectively, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and BAYLOR was actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference

or disregard to the rights, safety, or welfare of others. Ms. Doe therefore seeks exemplary damages in an amount within the jurisdictional limits of the Court.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Doe seeks a judgment against BAYLOR as follows:

A.      An award of damages in an amount to be established at trial, including, without limitation, payment of Ms. Doe's expenses incurred as a consequence of the sexual assault; damages for deprivation of equal access to the educational benefits and opportunities provided by BAYLOR; and damages for past, present, and future emotional and physical pain and suffering, ongoing and severe mental anguish, and loss of past, present, and future enjoyment of life as a result of being raped;

B.      An award of pre- and post-judgment interest;

C.      An award of costs and attorney fees, pursuant to 42 U.S.C. § 1988(b); and

D.      Such other relief as is proper.

Ms. Doe demands a trial by jury of all issues so triable.

DATED:  February 17, 2017

Respectfully submitted,

By:_____/s/ *William W. Johnston*_____
    William W. Johnston, 10846700
    LAW OFFICE OF WILLIAM W. JOHNSTON
    400 Austin Ave, Suite 104
    Waco, TX  76701
    Telephone, 254-732-2255
    FAX  254-732-2265
    EMAIL: billjohnstonlawoffice@gmail.com

By:_____/s/ *John Clune*_____
    John Clune, Colorado Bar No. 27684
    Christopher W. Ford, Colorado Bar No. 28632
    Lauren E. Groth, Colorado Bar No. 47413
    HUTCHINSON BLACK AND COOK, LLC
    921 Walnut Street, Suite 200
    Boulder, CO  80302
    Telephone: 303-442-6514
    FAX: 303-442-6593
    E-mail: clune@hbcboulder.com,
    ford@hbcboulder.com

    ATTORNEYS FOR PLAINTIFF
    ELIZABETH DOE